241 N.J. Super. 578 (1990)
575 A.2d 888
LUCY FIGUEROA, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF JOSE FIGUEROA, AND LUCY FIGUEROA, INDIVIDUALLY, PLAINTIFF-APPELLANT,
v.
HARTFORD INSURANCE COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 1, 1990.
Decided June 19, 1990.
*580 Before Judges MICHELS, DEIGHAN and BROCHIN.
William D. Levinson argued the cause for appellant (Levinson, Axelrod, Wheaton & Grayzel, attorneys; Richard J. Levinson, of counsel; Robert E. Bennett, on the brief).
Eugene M. Purcell argued the cause for respondent (Purcell, Ries, Shannon & Mulcahy, attorneys; Eugene M. Purcell, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Plaintiff Lucy Figueroa, as administratrix ad prosequendum of the estate of Jose Figueroa and individually, appeals from a summary judgment of the Law Division entered in favor of defendant Hartford Insurance Company in this action to recover under an automobile insurance policy.
The facts giving rise to this appeal are not in dispute. In February 1982, Douglas Lynch (Lynch) struck and killed Jose Figueroa (decedent) with his automobile. In May 1982, Lynch was indicted and charged with murder in violation of N.J.S.A. 2C:11-3, aggravated assault in violation of N.J.S.A. 2C:12-1b(1) and possession of a weapon without any explainable lawful purpose in violation of N.J.S.A. 2C:39-3(e). Lynch was subsequently found guilty of manslaughter in violation of N.J.S.A. 2C:11-4b(2) and was sentenced to State Prison for ten years *581 with a three-year period of parole ineligibility. In August 1984, we affirmed Lynch's conviction and the sentence imposed in an unpublished opinion State v. Lynch, (A-2944-82T4). The New Jersey Supreme Court denied Lynch's petition for certification in February 1985. State v. Lynch, 101 N.J. 215, 501 A.2d 897 (1985).
At the time of the incident in question, Lynch was insured under an automobile insurance policy issued by defendant which contained the standard exclusion for intentional acts. Specifically, the insurance policy, in pertinent part, provided:
This policy does not apply ... to bodily injury or property damage caused intentionally by or at the direction of the insured.
In March 1982, defendant learned of the incident and undertook an investigation. A non-waiver agreement was signed by the parties. Although there is some disagreement as to what steps defendant took to investigate the incident, defendant acquired newspaper articles, spoke to the police, acquired the names of three witnesses and spoke to Lynch's attorney. In June 1982, defendant disclaimed coverage on the basis of the intentional acts exclusion in the policy. Specifically, the disclaimer letter stated:
Your policy 79 GM 653042 under Section 1, Liability, Part 5 Exclusion states:
"this policy does not apply under Section I, Paragraph (b) to bodily injury or property damage caused intentionally by or at the direction of the insured."
Based on that Exclusion, we will be unable to provide you with any coverage under the above-mentioned policy.
We will, however, consider any new information you wish to present to us and will reconsider the matter after the charges presently pending against the insured are decided and/or when the official investigation becomes available to us.
In October 1982, plaintiff filed suit against Lynch seeking damages resulting from decedent's death. In December 1985, a default judgment was entered against Lynch in favor of plaintiff in the amount of $767,325.00 together with $289,964.76 in pre-judgment interest. Lynch subsequently assigned to plaintiff any and all rights and interest he had against defendant under his insurance policy as well as the judgment.
*582 In April 1987, plaintiff instituted this action against defendant seeking to recover under Lynch's insurance policy the amount of the default judgment, together with the accrued interest. Plaintiff claimed that defendant breached its insurance contract with Lynch, negligently investigated and handled Lynch's case and breached the covenants of good faith and fair dealing implied in the insurance contract. After issue was joined, defendant moved for summary judgment. Judge Lintner in the Law Division held that voluntary manslaughter involves a criminal intent and, as such, defendant was not liable under the intentional acts exclusion clause of the insurance policy. The trial court also ruled that defendant's conduct during its investigation did not create coverage under principles of estoppel. Accordingly, summary judgment was granted in favor of defendant. This appeal followed.

I.
Plaintiff first contends that she is entitled to judgment under the holding in Ruvolo v. American Casualty Co., 39 N.J. 490, 189 A.2d 204 (1963), because "proof of the insured's incapacity to act in accordance with reason, will remove tortiously committed acts from the exclusionary provisions of the carrier's policy." In other words, plaintiff claims that Lynch was so overcome by passion when he committed the homicide that he was not acting "intentionally" within the meaning of the intentional acts exclusion clause of the policy. We disagree.
Preliminarily, we note that "[p]olicy provisions that exclude coverage for liability resulting from intentional wrongful acts are `common,' are `accepted as valid limitations,' and are consistent with public policy." Allstate Ins. Co. v. Malec, 104 N.J. 1, 6, 514 A.2d 832 (1986); Ruvolo v. American Casualty Co., supra, 39 N.J. at 496, 189 A.2d 204. In fact, it has been held that it is against public policy for an insurance carrier to provide coverage for intentional wrongs as such would encourage malicious action without regard for the pecuniary consequences. *583 Ambassador Ins. Co. v. Montes, 76 N.J. 477, 482-483, 388 A.2d 603 (1978). As the Ambassador Court noted:
Were a person able to insure himself against the economic consequences of his intentional wrongdoing, the deterrence attributable to financial responsibility would be missing. Further, as a matter of moral principle no person should be permitted to allege his own turpitude as a ground for recovery. Accordingly, we have accepted the general principle that an insurer may not contract to indemnify an insured against the civil consequences of his own willful criminal act. [Id. at 4831, 388 A.2d 603].
Exclusionary clauses are, however, to be strictly construed against the insurance carrier. "[T]he insured is entitled to protection to the full extent that any reasonable interpretation of them will permit." Ruvolo v. American Casualty Co., supra, 39 N.J. at 498, 189 A.2d 204. Accordingly, "[t]he burden is the carrier's to bring the case within the policy exclusion." Burd v. Sussex Mut. Ins. Co., 56 N.J. 383, 399, 267 A.2d 7 (1970). United Rental Equip. Co. v. Aetna Life & Casualty Ins. Co., 74 N.J. 92, 99, 376 A.2d 1183 (1977).
It is also well settled in New Jersey that an injured party is collaterally estopped from relitigating an insured's intent after such has been settled in a previous criminal action. New Jersey Mfrs. Ins. Co. v. Brower, 161 N.J. Super. 293, 391 A.2d 923 (App.Div. 1978). See Allstate Ins. Co. v. Schmitt, 238 N.J. Super. 619, 633, 570 A.2d 488 (App.Div. 1990); Tal v. Franklin Mut. Ins. Co., 172 N.J. Super. 112, 117, 410 A.2d 1194 (App.Div.), certif. den., 85 N.J. 103, 425 A.2d 267 (1980). See also Erie Ins. Co. v. Belcher, 718 F. Supp. 475, 478 (S.D.W. Va. 1989); Annotation, Insurance Coverage  Conviction, 35 A.L.R. 4th 1063 (1985). Cf. Garden State Fire & Casualty Co. v. Keefe, 172 N.J. Super. 53, 410 A.2d 718 (App.Div.), certif. den., 84 N.J. 389, 420 A.2d 317 (1980). In other words, where an insured has been adjudged guilty of intentional criminal conduct, a party injured by the insured's actions has no cause of action against the insured's carrier for damages where the policy in question specifically excludes coverage for injuries caused by intentional acts. New Jersey Mfrs. Ins. Co. v. Brower, supra, 161 N.J. Super. at 299-300, 391 A.2d 923; Tal v. *584 Franklin Mut. Ins. Co., supra, 172 N.J. Super. at 116-117, 410 A.2d 1194.
In New Jersey Mfrs. Ins. Co. v. Brower, supra, the insured Brower shot and wounded William Geschke. Brower was convicted of assault with intent to kill. The jury's verdict against Brower was predicated upon a finding that Geschke's injuries were intentionally inflicted by Brower. On appeal in the coverage action, the issue raised was whether the doctrine of collateral estoppel barred Geschke from relitigating with Brower's insurance carrier, the question of Brower's intent at the time of the incident. We determined that Geschke was barred from relitigating the issue and affirmed the grant of summary judgment in favor of the insurance carrier. Discussing the doctrine of collateral estoppel, we noted:
The doctrine of collateral estoppel is a branch of the broader law of res judicata which bars relitigation of any issue actually determined in a prior action generally between the same parties and their privies involving a different claim or cause of action. This doctrine has been applied in civil actions to conclude a party as to an issue actually determined against it not only in prior civil actions, but in prior criminal proceedings as well. Thus a criminal conviction can bar the person convicted and his privies as to an issue of fact necessarily determined by the conviction and material to a civil litigation to which he is a party. In fact, in New Jersey evidence of a judgment convicting a party of an indictable offense may be introduced against that party in a civil proceeding to prove any fact essential to sustain the judgment.
The doctrine of collateral estoppel is not rendered inapplicable by virtue of the fact that the parties in the civil action are not the same as those in the criminal proceeding. Complete identity of parties is no longer required. Collateral estoppel until recently was available only where there was mutuality of estoppels, that is, only where the party taking advantage of the earlier adjudication would have been bound by it, had it gone the other way. The requirement of mutuality is no longer rigidly adhered to in this state. The more flexible modern view has been tentatively formulated by the American Law Institute as follows:
A party precluded from relitigating an issue with an opposing party, in accordance with §§ 68 and 68.1, is also precluded from doing so with another person unless he lacked full and fair opportunity to litigate the issue in the first action or unless other circumstances justify affording him an opportunity to relitigate the issue.
[Id. at 297-298, 391 A.2d 923 (citations omitted)].
*585 We also determined that neither Geschke nor his insurance carrier had to be a party to the criminal proceedings to be bound by the jury's conclusion. As Geschke's rights were derivative from Brower's and Brower had every reason to establish at his criminal trial that his actions were not intentional, Geschke was barred from attempting to establish that Brower's actions were unintentional. We further explained:
As a result of the virtual abandonment of the principle of rigid mutuality Manufacturers did not have to be a party to the prior criminal proceedings to benefit from collateral estoppel. While Geschke also was not a party to those proceedings, he was in privity with Brower. Therefore, he is barred from relitigating any issue necessarily decided against Brower in the earlier criminal action. Geschke's rights under the insurance policy are derivative from those of Brower. In effect, Geschke stands in the shoes of Brower with respect to the liability policy involved. See Burd v. Sussex Mut. Ins. Co., 56 N.J. 383, 397 [267 A.2d 7] (1970). Moreover, there was an identity of interest between Geschke and Brower at the time of the criminal proceedings. Brower, who was charged with, among other crimes, assault with intent to kill, was afforded a full opportunity to litigate the issue of his guilt. He had every reason to make as vigorous and effective a defense as possible. His personal interests would have been served by establishing that he did not intend to assault Geschke because he would have avoided criminal responsibility for the assault and retained his liability coverage. Geschke had a similar interest in the outcome of the trial because coverage would not be precluded if Brower did not intentionally assault him. [Id. at 299, 391 A.2d 923].
See Tal v. Franklin Mut. Ins. Co., supra, 172 N.J. Super. at 116-117, 410 A.2d 1194; Erie Ins. Co. v. Belcher, supra, 718 F. Supp. at 477-478; Travelers Indem. Co. v. Walburn, 378 F. Supp. 860, 868 (D.D.C. 1974).
Here, Lynch was found guilty of manslaughter in violation of N.J.S.A. 2C:11-4b(2). N.J.S.A. 2C:11-4, describing the crime of manslaughter, provides:
Manslaughter. a. Criminal homicide constitutes aggravated manslaughter when the actor recklessly causes death under circumstances manifesting extreme indifference to human life.
b. Criminal homicide constitutes manslaughter when:

(1) It is committed recklessly; or
(2) A homicide which would otherwise be murder under section 2C:11-3 is committed in the heat of passion resulting from a reasonable provocation. [Emphasis added].
c. Aggravated manslaughter is a crime of the first degree and upon conviction thereof, a person may, notwithstanding the provisions of paragraph (1) of *586 subsection a. of N.J.S. 2C:43-6, be sentenced to an ordinary term of imprisonment between 10 and 30 years. Manslaughter is a crime of the second degree.
It is settled beyond question that voluntary manslaughter described in N.J.S.A. 2C:11-4b(2) is an intentional crime while involuntary or reckless manslaughter described in N.J.S.A. 2C:11-4b(1) is characterized by a lack of criminal intent. As our Supreme Court observed in State v. Bonano, 59 N.J. 515, 522-523, 284 A.2d 345 (1971), the crime of manslaughter is divided
into (1) voluntary or intentional and (2) involuntary or unintentional, manslaughter. 40 C.J.S., Homicide, § 37, pp. 897-898; State v. Prewitt, 104 Ariz. 326, 452 P.2d 500, 506 (1960); People v. Miller, 114 Cal. App. 293, 299 P. 742 (1931). The latter, involuntary manslaughter, is an unintentional homicide, committed without excuse or justification, under circumstances not manifesting or implying malice. Clark & Marshall, supra, § 10.12, p. 710; 1 Wharton, supra, § 272, p. 577; 40 Am.Jur.2d, Homicide, § 70, p. 362. Death occasioned by driving an automobile without regard for the life and safety of others (now covered by statute, N.J.S.A. 2A:113-9), or causing death as a result of the reckless handling of a loaded firearm, are examples of the common law crime of involuntary manslaughter. State v. Morales, 111 N.J. Super. 521, 526 [269 A.2d 530] (App.Div. 1970), certif. den., 57 N.J. 433 [273 A.2d 60] (1971). See Charge to Grand Jury, 9 N.J.L.J. 167 (O. & T. 1886); State v. Hardie, 47 Iowa 647, 29 Am.Rep. 496 (1878). Quite clearly we are not here dealing with this kind of dereliction.

Voluntary manslaughter, on the other hand, is an intentional homicide done in sudden passion or heat of blood, without malice aforethought. Clark & Marshall, supra, § 10.11, p. 693. It has been said with respect to an intentional killing that "to reduce the crime from murder to manslaughter it must appear that the killing occurred during the heat of a passion resulting from a reasonable provocation, a passion which effectively deprived the killer of the mastery of his understanding, a passion which was acted upon before a time sufficient to permit reason to resume its sway had passed." State v. King, 37 N.J. 285, 300 [181 A.2d 158] (1962). This is the category of manslaughter that concerns us here. State v. Guido, 40 N.J. 191, 209-211 [191 A.2d 45] (1963); State v. McAllister, 41 N.J. 342, 353 [196 A.2d 786] (1964). [Emphasis added].
See State v. Pitts, 116 N.J. 580, 611, 562 A.2d 1320 (1989) (passion/provocation or voluntary manslaughter is an intentional homicide done in sudden passion or heat of blood, without malice aforethought); 2 Wharton's Criminal Law § 153 (14th ed. 1979) ("[v]oluntary manslaughter is an intentional killing in the heat of passion as a result of severe provocation. As a concession to human frailty, a killing, which *587 would otherwise constitute murder, is mitigated to voluntary manslaughter.")
Applying these principles here, we have no hesitancy in concluding that plaintiff is collaterally estopped from relitigating with defendant the issue of Lynch's intent in committing the crime of voluntary manslaughter in violation of N.J.S.A. 2C:11-4b(2). The jury verdict finding Lynch guilty of that crime conclusively establishes that Lynch acted intentionally when he killed decedent. Plaintiff cannot now relitigate that issue.
Plaintiff's argument that, under the standards set forth in Ruvolo, conduct amounting to voluntary manslaughter is exempted from the scope of an intentional acts exclusion clause is incorrect. Ruvolo, who shot and killed his associate, La Face, was covered by a liability policy which contained a standard intentional acts exclusion clause. Upon his arrest, Ruvolo was certified to be insane and committed to the New Jersey State Hospital at Trenton without a criminal trial. La Face's administratrix brought a suit for damages against Ruvolo which the insurance company refused to defend. The company claimed Ruvolo's actions were intentional and hence were not covered under the policy. Ruvolo's guardian then sought a declaration as to whether the insurance company was liable. The trial court held that the insurance company was liable for any judgment rendered against Ruvolo. The Supreme Court affirmed, determining that where an act is committed while the actor is criminally insane, the act cannot be considered "intentional" within an exclusionary clause. The Court reasoned that:
We have no doubt that if a homicidal act of an insured is of such character as to excuse him from criminal responsibility because of insanity, i.e., because at the time of its commission he did not have the mental capacity to understand the nature and quality of his act, or to be able to distinguish between right and wrong with respect to it, the killing should not be considered "intentional" within the meaning of the defendant's policy. [Ruvolo v. American Casualty Co., supra, 39 N.J. at 498, 189 A.2d 204].
*588 Recognizing that exclusionary clauses must be narrowly drawn and interpreted, the Court held that coverage should not be limited to those cases where the insured is legally insane but should be extended to those instances where the actor was so deranged that he could not act rationally, stating
while such mental incapacity as would excuse an act from criminal responsibility would preserve the insured's protection under this policy, in our opinion coverage should not be limited to cases which satisfy that definition. We hold that if the insured was suffering from a derangement of his intellect which deprived him of the capacity to govern his conduct in accordance with reason, and while in that condition acting on an irrational impulse he shot and killed Dr. La Face, his act cannot be treated as "intentional" within the connotation of defendant's insurance contract. [Id.].
Contrary to plaintiff's assertion, we do not read Ruvolo to hold that voluntary manslaughter, as defined by N.J.S.A. 2C:11-4b(2), is included within the scope of unintentional acts. Conversely, it is only when the person is insane or so deranged that he or she could not act rationally that his or her conduct is unintentional. Here, of course, Lynch's conviction for voluntary manslaughter established that at the time of decedent's death, Lynch was not insane or suffering from a mental derangement of the nature and kind identified in Ruvolo as unintentional. His conviction for manslaughter in violation of N.J.S.A. 2C:11-4b(2) established that Lynch committed an intentional act. The fact that the jury found that Lynch committed the homicide in the heat of passion does not render the criminal conduct involuntary. Rather, it simply reduced the crime from murder to manslaughter.
Consequently, plaintiff is bound by the jury's determination that Lynch intentionally killed decedent and, as such, she has no recourse against defendant under Lynch's policy.

II.
Plaintiff also contends that defendant is estopped from denying coverage under the policy because it improperly disclaimed liability. Here again we disagree. Equitable estoppel is defined as

*589 [t]he effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy. [Highway Trailer Co. v. Donna Motor Lines, Inc., 46 N.J. 442, 449 [217 A.2d 617], cert. den. sub nom., Mount Vernon Fire Ins. Co. v. Highway Trailer Co., 385 U.S. 834, 87 S.Ct. 77, 17 L.Ed.2d 68 (1966) (quoting 3 Pomeroy's Equity Jurisprudence § 804 (5th ed. 1941))].
See Carlsen v. Masters, Mates & Pilots Pension Plan Trust, 80 N.J. 334, 339, 403 A.2d 880 (1979); O'Neill v. Washington Township, 193 N.J. Super. 481, 487, 475 A.2d 55 (App.Div. 1984). Equitable estoppel prevents "a party's disavowal of previous conduct if such repudiation `would not be responsive to the demands of justice and good conscience.'" Carlsen v. Masters, Mates & Pilots Pension Plan Trust, supra, 80 N.J. at 339, 403 A.2d 880; Royal Assocs. v. Concannon, 200 N.J. Super. 84, 92, 490 A.2d 357 (App.Div. 1985). "Equitable estoppel can arise from any type of `conduct of a party, using that word in its broadest meaning as including his spoken or written words, his positive acts, and his silence or negative omission to do anything.'" Royal Assocs. v. Concannon, supra, 200 N.J. Super. at 92, 490 A.2d 357. Under this principle,
[c]onduct amounting to a misrepresentation or concealment of material facts, known to the party allegedly estopped and unknown to the party claiming estoppel, done with the intention or expectation that it will be acted upon by the other party and on which the other party does in fact rely in such a manner as to change his position for the worse gives rise to an equitable estoppel. [Carlsen v. Masters, Mates & Pilots Pension Plan Trust, supra, 80 N.J. at 339, 403 A.2d 880].
It is well settled in New Jersey that "[u]nder certain circumstances an insurance carrier may be estopped from asserting the inapplicability of insurance to a particular claim against its insured despite a clear contractual provision excluding the claim from the coverage of the policy." Griggs v. Bertram, 88 N.J. 347, 355-356, 443 A.2d 163 (1982); Garcia v. Snedeker, 199 N.J. Super. 254, 263-264, 489 A.2d 175 (App.Div. 1985); American Handling Equip. v. T.C. Moffatt & Co., 184 N.J. Super. 131, 140-144, 445 A.2d 428 (App.Div. 1982). In other words, "a *590 carrier who has issued a policy, by its later conduct may, for equitable reasons, be refused the right to assert an exclusion or the absence of specific coverage." American Handling Equip. v. T.C. Moffatt & Co., supra, 184 N.J. Super. at 139, 445 A.2d 428.
Here, the trial court properly concluded that defendant did not unreasonably delay in notifying Lynch of its intent to disclaim under the policy. Defendant notified Lynch of the disclaimer on June 8, 1982, less than four months after the February 25, 1982 incident. Moreover, contrary to plaintiff's claim, there has been no showing of any wrongful conduct on the part of defendant during its investigation or that Lynch was prejudiced in any way by defendant's investigation. Although there was disagreement between the parties as to what steps defendant actually took to determine coverage under the policy, it is clear that defendant properly investigated the matter prior to declining coverage.
Finally, the fact that defendant's inter-office memo displays some uncertainty as to whether disclaimer was proper is of no moment. In contrast to plaintiff's contention, the memo actually demonstrates defendant's good faith. Recognizing its obligation to promptly notify Lynch of its position, defendant decided that from the information it had acquired it should disclaim rather than wait longer and possibly prejudice Lynch in any way. In addition, defendant notified Lynch that it would "consider any new information ... and [would] reconsider the matter after the charges ... [were] decided and/or when the official investigation [became] available...." Clearly, defendant acted so as to safeguard Lynch's rights and not to prejudice him in any way.
Accordingly, the summary judgment under review is affirmed.